## CHICAGO, R. I. & P. RY. CO. v. DE VORE.

No. 3340. Opinion Filed September 15, 1914.

Rehearing Denied October 13, 1914.

(143 Pac. 864.)

1.    MASTER AND SERVANT—Injury to Servant—Safety—Duty of Master. It is the duty of the master to furnish his servants a reasonably safe place to work; reasonably safe appliances with which to work; reasonably safe material to work with; and reasonably competent fellow servants.

2.    SAME—Negligence of Fellow Servant—Liability of Master. The master is liable for the negligent acts of his servant, resulting in injury to a fellow servant, while performing services for his master within the general scope of his employment, although at the time of the injury he may be acting in violation of express orders of his master.

3.    SAME—Injury to Engineer—Negligence of Fireman—Scope of Employment. The evidence shows that the duty of the fireman, plaintiff's coservant, at the time of the injury, in addition to firing the engine, was to assist plaintiff as engineer in keeping up and repairing the engine when called upon to do so by the engineer; but the fireman had no authority to repair the engine, except when requested so to do. Held, that the fireman, in repairing the engine, although without any request to do so, and in violation of orders of his master, was working within the general scope of his employment.

4.    SAME—Negligence—Scope of Employment—Question for Jury. The engine on which plaintiff and his coemployee were working at the time of plaintiff's injury had a fireman's cab, separate from the engineer's cab. Each of said cabs was constructed to contain a water glass, the purpose of which was to be used by the engineer to keep informed as to the condition of the water in the boiler. On the day plaintiff was injured, the engine was sent out with only one water glass; there being none in the fireman's cab. The engineer was not informed of the absence of said water glass until out on the road. The fireman, without the knowledge and without any orders from the engineer, secured a glass which was too short and attempted to put it in. Plaintiff was called to the fireman's cab by the fireman, and as he reached the point near the water glass, it exploded, destroying his eye. Held, that the fireman, in replacing the water glass, was performing services for his master, and acting within the general scope of his employment. Held, further, that the question of negligence of the master, as well as that of the plaintiff's coservant, was, under all the facts and circumstances, a question of fact for the jury.

5.    **DAMAGES**—Personal Injuries—**Excessive Recovery.**  Plaintiff was a man 34 years old and physically strong at the time of the accident; had worked his way up to the position of engineer in the railroad service; had prepared himself and selected this for his life's work; was receiving from an average of $125 to $130 per month.  His earning capacity by reason of the injury was reduced $65 per month. · His injury disqualifies him from ever holding the position of engineer with any railroad company.  His expectancy, according to the American Mortality Table, is 34 years.  He ˙suffered a great deal of pain for fifteen days; was under the care of a physician for about four months.  The sight of his eye was entirely destroyed.  There is nothing in the record to indicate that the jury was influenced by passion or prejudice, except it be the amount of the verdict.  The verdict was approved by the trial court.  **Held,** that it is not shown that the trial court abused its discretion in approving the verdict.  **Held,** further, that a verdict of $15,000 is not excessive.

(Syllabus by the Court.)

*Error from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Action by Isaac De Vore against the Chicago, Rock Island & Pacific Railway Company.  Judgment for plaintiff, and defendant brings error.  Affirmed.

*C. O. Blake, H. B. Low, R. J. Roberts,* and *W. H. Moore,* for plaintiff in error.

*W. N. Maben* and *Stuart, Cruce & Gilbert,* for defendant in error.

RIDDLE, J.  The allegations of negligence, so far as important here, are:

"That on the morning herein complained of the agents, servants, and employees, as well as the defendant, negligently and carelessly failed to make an inspection of said engine, and negligently and carelessly permitted said engine to go out of the roundhouse without any water glass on the side next to the fireman or any shield surrounding the place where said water glass should have been; that, without consulting him, the said fireman went over to the steam shovel engineer and obtained a water glass, which he negligently attempted, without the knowledge or consent of the plaintiff, to put in, and that the same was too short and was an inadequate piece of machinery or implement, and that, on account of the same being too short, the said fireman was unable to properly adjust the same so as to pre-

vent the escape of water and steam; and plaintiff says on account of the fireman's negligent attempt to adjust the same, and on account of the fact that the same was too short to be properly adjusted, the said water glass exploded, inflicting the injuries complained of.   *   *   *"

In the third paragraph, it is alleged:

"That by reason of the negligence of the defendant, its agents and servants, in failing to provide said engine with a water glass and with a proper shield, and by reason of said fireman's negligence, that said engine was an unsafe and improper place in which to do and discharge his duties;   *   *   * and that said negligent acts on the part of the defendant company, its agents and servants, was the proximate cause of the injury."

The undisputed evidence shows the following facts: Plaintiff resided and was employed by defendant company in the city of El Reno as engineer, working upon what is known as the Belt Line. He had been an engineer since the year 1906. On the 21st day of January, 1910, plaintiff was given an engine constructed with the engineer's cab about midway of the boiler and with the fireman's cab near the rear of the boiler, about twelve or fifteen feet from the engineer's cab. The engine was turned over to plaintiff about 6:15 in the morning by the hostler, and he was assured that the engine was in working condition and ready for him to take. The engine was known as the 1891 class; was equipped the same as other engines, except it had two water glasses, which required two shields. That when they were in proper condition, they were so equipped. That the purpose of the two water glasses was that the engineer and fireman might be advised of the height of the water in the boiler. That when the water becomes too low, there is danger of a boiler explosion. That, after they had left the roundhouse with the engine some distance, the engineer was notified by the fireman that there was no water glass in the fireman's cab, but had no notice there was no shield. That said engine and all engines of like class in common use by defendant railway company, as well as all other railway companies, were equipped with two water glasses and shields. After they had been out some time, the fireman went

to the engineer to get his tools, stating that he would get every-
thing ready for him to put in a water glass. That later the fire-
man went to the engineer's cab and requested him to come into
the fireman's cab. Plaintiff's own language on this point was
as follows:

"He came to the runway and called me to come back into
his cab, and I had a minute that I could get away about that time,
and I went back, and when I got back, there is about two steps
from the runway, down into his cab, and I stepped down, or
rather jumped down and into the back of the engine, and straight-
ened up to ask him, 'What do you want?' fixing a water glass
at that time, and the water glass exploded and a piece of it
struck me in the eye."

The evidence shows that the injury resulted in the loss of
plaintiff's eye; that he was under treatment of an oculist for
several months and suffered a great deal of pain for a period
of fifteen days; that the first work he did after the injury was
on the 10th day of June; that his average monthly salary as en-
gineer up to the time he received the injury was from $125 to
$130 per month; that he had been engaged in the railway ser-
vice since 1899, and was, at the time of the trial, 34 years old;
that on or about the 10th day of June, after the injury, he was
employed as a stationary engineer at El Reno at a salary of
$2 per day; that his injury unfits and disqualifies him from serv-
ing as engineer upon any railroad; that when the engine was
properly equipped with water glasses and shields there was prac-
tically no danger of injury from explosion of the glass. The
duties of the fireman who was working with plaintiff on the
engine were to fire the engine and to assist the engineer in tak-
ing care of and repairing the engine when called upon and di-
rected by the engineer so to do. The fireman had no authority
to make repairs on the engine, except when ordered or requested
to do so by the engineer. The water glass which the fireman
attempted to put in was too short. When the engineer was
called to the fireman's cab, he had no notice that the fireman had
attempted to put the water glass in, or that it was too short, and
had no notice that there was no shield around the same, until
after the explosion and the injury. The water glass in or near

the fireman's cab was not an absolute necessity, but was on all engines of this class, and it was more convenient for the fireman to have it.

The principal contentions, presented and argued together under the first and second assignments of error, are as follows: First, the court erred in overruling the motion for a new trial, for the reason that the verdict was not sustained by sufficient evidence; second, the court erred in overruling the motion for new trial, for the reason that the verdict was contrary to law.

It is earnestly contended that the evidence is insufficient to sustain the verdict and judgment of the court. Under this general head, it is contended: First, that there was no evidence tending to prove that furnishing the engine with only one water glass, instead of two, either affected the use of the instrument furnished, or made it the least dangerous. Considering this phase of the case, standing alone and disconnected from the other propositions, counsel might be correct in their contention. We are convinced, however, that this case cannot be disposed of properly by disconnecting this point from the other facts and considering it, standing alone. This point is so intermingled with the other propositions raised that, in order to dispose of the case upon sound principles and arrive at a proper legal conclusion, it must be considered in connection with the other points involved.

It is, in effect, admitted by counsel in their brief that if the fireman, the coservant of plaintiff, was acting within the scope of his employment at the time he was repairing the water glass, and was engaged in performing services for the master, and if he was guilty of negligence in performing such service, and as a result of such negligence plaintiff sustained the injury complained of, the master would be liable. Counsel for defendant company state the proposition as follows:

"No rule of law is better settled than that a master is responsible for wrongs committed by his agent or servant while acting about the business of the master and within the scope of the employment of the agent or servant; but it is equally recog-

nized that the master is not responsible for the acts of a servant when the servant acts outside of the scope of his employment and authority."

Assuming this to be substantially the · correct rule of law governing the relation of master and servant as applied to this case, what are the rights of the parties? Was the servant, while attempting to replace the water glass, acting without the scope of his employment? Or was he acting within the general scope of his employment, but acting contrary to the orders of the master? The undisputed evidence shows that part of the duties of the fireman, in addition to firing the engine, were to assist in looking after the engine and making repairs on the same when requested or ordered to do so by the engineer. To assist the engineer in repairing the engine was contemplated by the contract of employment. It was part of the duties which he was expected to perform, and which he was paid to perform, although he was not authorized to make repairs on the engine and otherwise assist the engineer in repairing the same, except when so ordered by the engineer. It cannot be doubted that such services were within the general scope of his employment, and were so contemplated by the parties under the contract of employment. It was as much a part of his duties, when called upon by the engineer, to assist in repairing the engine, either in conjunction with him, or alone, as it was to fire the engine. In the latter instance he was free to use his own judgment; when in the former he was not to perform the services except by request of the engineer. By the great weight of authority, the law is that, where a servant acts within the general scope of his employment, and while engaged in service for the master, if he acts in a negligent manner, resulting in injury to a coservant or a third person, the master is liable for the injury, although such acts may be contrary to the positive rule or order of the master. The rule was laid down by the Supreme Court of the United States in the case of *Philadelphia & Reading Railroad Co. v. Derby*, 14 How. 468, 14 L. Ed. 502, in the following language:

"The rule of 'respondeat superior,' or that the master shall · be civilly liable for the tortious acts of his servant, is of universal

application, whether the act be one of omission or commission, whether negligent, fraudulent, or deceitful. If it be done in the course of his employment, the master is liable; and it makes no difference that the master did not authorize, or even know of, the servant's act or neglect, or, even if he disapproved or forbade it, he is equally liable if the act be done in the course of his servant's employment. See Story on Agency, sec. 452; Smith on Master and Servant, 152."

In Wharton on Negligence, sec. 157, the rule is thus stated:

"'That he who puts in operation an agency which he controls, while he receives its emoluments, is responsible for the injuries it incidentally inflicts. Servants are, in this sense, machines, and for the defects of his servants, within the scope of their employment, the master is as much liable as for the defects of his machines.'"

Cooley on Torts, sec. 539, states the rule as follows:

"It is immaterial to the master's responsibility that the servant, at the time, was neglecting some rule of caution which the master had prescribed, or was exceeding his master's instructions, or was disregarding them in some particular, and that the injury which actually resulted is attributable to the servant's failure to observe the directions given him. In other words, it is not sufficient for the master to give proper directions; he must also see that they are obeyed."

In the case of *Gann v. Great Southern Lumber Co.,* 131 La. 400, 59 South. 830, the Supreme Court of Louisiana, discussing the proposition under consideration, said:

" 'Though there is some conflict in the decisions as to the liability of a corporation for the torts of its officers and agents,' says a well-known writer, 'the following propositions are supported by the weight of authority: (1) As a general rule, a corporation is liable like a natural person, for the torts of its officers or agents within the scope or apparent scope of their authority.' Marshall on Corporations, p. 307."

In *Barrett v. Minneapolis, St. P. & S. Ste. M. Ry. Co.,* 106 Minn. 51, 117 N. W. 1047, 18 L. R. A. (N. S.) 416, 130 Am. St. Rep. 585, the court stated the rule as follows:

"A master is responsible for the torts of his servant done in the course of his employment with a view to the furtherance of his master's business, and not for a purpose personal to him-

self, whether the same be done willfully, but within the scope of his agency, or in excess of his authority, or contrary to the express instructions of the master."

Thompson on Negligence, sec. 518, states the general rule as follows:

"It is a general rule of law that a principal or master is civilly responsible for wrongs committed by his agent or servant while acting about the business of the principal or master and within the scope of the employment of the agent or servant."

Section 530, *Id.*:

"Such being the nature of the master's liability, it is immaterial that the servant proceeded without orders touching the particular act; and the master will be liable if the act of the servant was within the general scope or sphere of his employment, even where the servant acted contrary to the master's express orders. A frequently recurring expression of this doctrine is that when the employee or servant, while engaged in the prosecution of the master's business, deviates from his instructions as to the manner of doing it, this does not relieve the master from liability for his acts."

In section 526 the writer states the rule in another form as follows:

"The test by which to determine whether the master is liable for the tortious act of his servant is not whether it was done during the existence of the employment, but whether it was done in the prosecution of the master's business. Upon this subject it has been said: 'In determining whether a particular act is done in the course of the servant's employment, it is proper, first, to inquire whether the servant was, at the time, engaged in serving his master.' "

Many more authorities might be quoted, but we deem it unnecessary. If it had been a part of the fireman's duty to assist the engineer in making repairs on the engine, without first having orders from the engineer, we take it that it would not be controverted that the master would be liable for the negligent acts of the fireman in performing such duties. The fact that the fireman was acting contrary to instructions can make no difference, under the rule, provided he was engaged at the time in working within the general scope of his employment, or within the general line of the business he was employed to transact, and

was performing services for the master. We are of the opinion that the facts show that the fireman, while repairing the engine, in attempting to replace the water glass, was acting within the general scope of his employment. The question as to whether or not he was negligent in performing such service for the master was a question to be determined by the jury from all the facts and circumstances. We are further of the opinion that the evidence, as shown from the record, justified the court in submitting to the jury the issue as to the concurring negligence of the master and the master's servant. In other words, it would appear from the admitted evidence that the injury was probably the result of the concurring negligence of the master and servant. The master permitted the engine to go out without proper equipment, such as the water glass and the shield. It is reasonably certain from the evidence that, had the engine been equipped with the proper glass and shield, the plaintiff would not have sustained the injury which he did. It is true, had the fireman not undertaken to replace the glass and use it without a shield, the injury would not have occurred; and it is the concurring acts of the master and servant which plaintiff claims were negligent, resulting in his injury, for which the master is liable. It is the contention of defendant, however, that the water glass in the fireman's cab was unnecessary and a useless ornament. In this contention, we are unable to agree. It is true that the evidence shows that in one sense the water glass was there only for convenience. No doubt, there are many attachments to different kinds of machinery, including locomotive engines, which are there only to make it more convenient in its use, and could, in fact, be dispensed with. However, when the master undertakes to make machinery more convenient by placing such attachments, it is incumbent upon him to use ordinary care to make such attachments and place them in such a manner as to make them reasonably safe. In other words, it is the duty of the master to furnish a reasonably safe place and reasonably safe appliances for his servant. It may be that the engineer could have dispensed with the water glass which was attached for his use in determining the condition of the water in the boiler. He, per-

haps, could have ascertained the condition of the water in the boiler by some other means, such as by stopping his engine and making a more extended examination, which would have required a longer period of time; and that it was only a matter of convenience that the water glass was placed in the engineer's cab. Yet, although it be placed there only for convenience in carrying on the master's business, it was incumbent on the master to have the water glass in a reasonably safe condition for the protection of his servants.

It is the contention of counsel for defendant that the court erred in giving instructions Nos. 2, 3, 5, 6, and 10 to the jury. From an examination of these instructions, as applied to the facts in this case, we are unable to agree with counsel. They admit that instruction No. 5 is a correct declaration of law, but contend that it was not applicable to the facts. In this, we think, counsel are in error. On the whole, we are of the opinion that this case was fairly submitted to the jury under the instructions given, and that there was no prejudicial error in this respect.

It is also contended that the court erred in refusing to give instructions Nos. 2, 3, 5, 7, and 8, requested by defendant. We are convinced that there is no merit in this contention. As we have said, all the issues raised by the pleadings were fairly submitted to the jury under the instructions given; and we are not convinced that plaintiff in error was prejudiced by the refusal of the trial court to give the requested instructions. The law on contributory negligence and assumption of risk was incorporated in instruction No. 11, and fully covered this issue.

It is lastly contended that the court erred in overruling the motion of defendant for a new trial, on account of excessive damages, appearing to have been given under the influence of passion and prejudice. Counsel call our attention to the rule laid down by this court in the case of *Independent Cotton Oil Co. v. Beacham,* 31 Okla. 384, 120 Pac. 969. In that case the injury sustained by plaintiff was to his leg, which was amputated below the knee, and a verdict for $25,000 returned. The court ordered a *remittitur* of all except $10,000. From the language used it is

apparent that the court followed the general rule, and held that this verdict was so excessive that at first blush it would shock the conscience of man. The court used this language:

"The record is unusually free from errors, and there is nothing to indicate prejudice or passion on the part of the jury, except the size of the verdict; but we would be justified in inferring that there was prejudice and passion from the magnitude of the verdict, and many courts have set aside verdicts as excessive from no other evidence."

While the court does not directly announce the rule we are announcing, it strongly tends toward adhering to this rule. The facts in the present case show plaintiff to be a young man, physically strong, enjoying good health, and having worked his way up in the railroad service to the important position of engineer, receiving on an average of from $125 to $130 per month; that he had prepared himself and had chosen this line of work as a calling for life; that his earning capacity, by reason of the injury, was reduced to about $65 per month; that he is forever disabled from holding a position with any railroad company as engineer, by reason of the injury; that he was 34 years old at the date of the injury, and, according to the American Mortality Table, his expectancy would be a little over 34 years; that he suffered a great deal of pain for about fifteen days; was under the care of a physician for about four months; that the sight of his injured eye is entirely destroyed. Taking 34 years as his expectancy as a basis, his earning capacity had been reduced $65 per month, which would amount to $23,120, without allowing for any increase in the way of advancement. Under ordinary conditions, had his earning power not been depreciated on account of the injury, it might be expected to increase. Taking the amount of the judgment in this case, $15,000, at 6 per cent. interest, it would earn him $900 per year, which would be $120 per year more than his earning power was reduced, leaving the difference for damages he suffered in the way of pain, inconvenience, and humiliation in going through life with only one eye. The question now arises, under all the facts and circumstances: Is the verdict in this case so excessive as to strike mankind at

first blush so unreasonable and disproportionate to the injury received as to shock their conscience? If this question must be answered in the affirmative, the judgment should be reduced; otherwise not.

The rule laid down by Chancellor Kent in the case of *Coleman v. Southwick,* 9 John. (N. Y.) 45, 6 Am. Dec. 253, is as follows:

"The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess."

We think this rule is sound, for the reason the jury and the trial judge have a much better opportunity than do the appellate judges to measure the actual damages suffered by the plaintiff and the amount which would compensate him for the injury. They have an opportunity of seeing the plaintiff and to discern his manner of testifying, his intelligence and capacity, to note his physical condition, and many other living evidences bearing upon the issue, including all the attending circumstances, of the larger part of which the appellate court is deprived. The jury, thus being in possession of all the facts and circumstances, is required to pass upon this issue as an issue of fact, under an appropriate charge of the court as to the law. Their solemn finding, returned into court and approved by the trial court, should not be disturbed by this court, unless it comes within the rule hereinbefore laid down. The trial judge has not only the opportunity afforded the jurors to gain knowledge of the conditions of the plaintiff's injury and the amount which will compensate him, together with all the facts and circumstances surrounding his injury, but he also has the opportunity of observing the jurors in considering said cause and of any outward feeling evidencing passion or prejudice that may be exhibited during the proceedings before him; and if it is made reasonably to appear that the verdict of the jury is excessive by reason of any influence of

passion or prejudice, it becomes his sworn and solemn duty, as a trial court, to set aside the verdict or require a *remittitur* to be filed. After he has considered this point on a motion for new trial and approved the verdict by overruling the motion, the appellate court should never disturb the finding and judgment of the trial court, except for the gravest reasons, wherein it clearly appears that the trial court has abused its discretion, or that the verdict is excessive within the rule herein stated. Quotations from many courts show this rule to be sound and in harmony with the weight of authority, and based upon reason and justice.

In the case of *Cleveland, C., C. & St. Louis Ry. Co. v. Hadley*, 170 Ind. 204, 82 N. E. 1025, 84 N. E. 13, 16 L. R. A. (N. S.) 527, 16 Ann. Cas. 1, in refusing to disturb a verdict of $10,000, the court said:

"The general principle is well established that this court will not reverse the judgment of the court below in refusing to grant a new trial on the ground of excessive damages, unless, at first blush, the damages assessed appear to be outrageous and excessive, or it is apparent that some improper element was taken into account by the jury in determining the amount [citing authorities]. The determination of the extent of the injury complained of, and the proper compensation therefor, were peculiarly within the province and power of the trial jury, and when its judgment has been fairly obtained, and, in the light of all the incidents of the trial, confirmed by the presiding judge, an abuse of this right and power must be clearly manifest to warrant an appellate court in disturbing the judgment on the ground of excessive damages."

In *Lee v. Southern Pac. R. Co.*, 101 Cal. 118, 35 Pac. 572, it was said:

"These cases hold that in actions of this character the law does not attempt to fix any precise rules for ascertaining what is a just compensation, but, from the necessity of the case, leaves the assessment of the damages to the good sense and unbiased judgment of the jury, whose province it is to make the assessment; that while the verdict in these cases, as in all others, is subject to review by the court, it will not be disturbed merely upon the ground that the damages are excessive, nor because the opinion of the court differs from that of the jury, but only

where it appears that the excess has been given under the influence of passion or prejudice."

In the case of *Union Pac. Ry. Co. v. Young,* 19 Kan. 488, the rule is stated as follows:

"The question was one peculiarly proper for the jury to determine; and although the verdict is large—larger perhaps than any member of this court would, as a juror, have returned—we cannot, in view of all the circumstances, say that such damages are so excessive as to strike the mind at first blush as being the result of bias or prejudice. To interfere, we must say that the jury acted under some improper influence or bias in the matter. This we cannot say. * * * The trial judge had some opportunity to determine from the defendant in error while on the witness stand as to his capacity for business, and his general intelligence, which is denied to us; and, considering all the facts in the case, we do not feel the liberty of saying that the verdict of the jury is so flagrant, or outrageously unjust, as to require of us, as a reviewing court, to set it aside and grant a new trial solely for excessive damages."

In the case of *Furnish v. Mo. Pac. Ry. Co.,* 102 Mo. 438, 13 S. W. 1044, 22 Am. St. Rep. 781, the duty of the trial judge was commented upon, and it was said:

"The trial court should, on motion, fearlessly and willingly reduce any verdict to its proper amount when the weight of the evidence indicates it is excessive. That judge has the advantage of forming his opinions from the living realities before him, and the impressions so obtained are far more reliable than those given by any transcript of the record on appeal. We therefore give great weight to his rulings on matters depending on the credibility of witnesses, on the physical appearances of parties, and the like. It is therefore of the utmost importance in the administration of justice that he should act firmly and promptly on such subjects and apply a proper corrective to any unwarranted findings thereon by juries. The cases in which we can properly interfere are exceptional."

In effect, this rule has been adhered to by this court in the case of *St. Louis & S. F. R. Co. v. Richards,* 23 Okla. 256, 102 Pac. 92, 23 L. R. A. (N. S.) 1032, in which case it is said:

"The last question to which counsel for defendant address themselves, and to which our attention is invited, is that the magnitude of the judgment is evidence of the fact that it was given under the influence of passion and prejudice. The amount of

injury received by the plaintiff and the amount of money redress defendant, if liable, should pay therefor is practically altogether a matter of judgment, the exercise of which is peculiarly the province of a jury. A court should interfere only when it can say from the facts proven in the case that this power has been clearly erroneously exercised, and that the judgment is of such amount that there is a deficiency of evidence to sustain it."

Quotations from a few decisions will disclose that, according to precedents of other courts, this verdict is not excessive.

In the case of *Tuohy v. Columbia Steel Co.,* 61 Ore. 527, 122 Pac. 36, plaintiff was a fireman in a machine shop. He lost the sight of one eye; was only out of work two months; was receiving $175 per month at the time of the injury, and two months after the injury, he received the same amount. Judgment was rendered in his favor for $11,300, which was sustained, with the exception of $950, which was improperly allowed as an element of damage.

In *St. Louis, S. F. & T. R. Co. v. Jenkins* (Tex. Civ. App.) 137 S. W. 711, plaintiff was helper to a boiler maker. The injury was the loss of one eye. A verdict for $11,000 was sustained. It does not appear what the amount of wages received, but, in all probability, it was not so large as an engineer's; the position he occupied not being so important.

In the case of *Galveston, H. & S. A. Ry. Co. v. Courtney,* 30 Tex. Civ. App. 544, 71 S. W. 307, plaintiff was a brakeman, 34 years old, earning $85 per month. The injury was the destruction and usefulness of one arm and hand, barring him from work. A verdict for $11,000 was sustained.

In *San Antonio & A. P. Ry. Co. v. Connell,* 27 Tex. Civ. App. 533, 66 S. W. 246, plaintiff was an engineer, earning from $135 to $150 per month; was 41 years old; lost the use of one leg, although it was not amputated. A verdict for $18,000 was cut to $16,000 and sustained.

In *Ribich v. Lake Superior Smelting Co.,* 123 Mich. 401, 82 N. W. 279, 48 L. R. A. 649, 81 Am. St. Rep. 215, the suit was for the loss of an eye. A verdict for $15,000 was cut to

$10,000 and affirmed. In this case plaintiff was earning only $1.60 a day before the accident, and earned $20 per month after the accident.

The verdict in this case is large, and we doubt, had any member of this court been sitting as a juror, whether he would have agreed to a verdict of this amount. However that may be, it is entirely a different question presented to us on this appeal. We cannot here substitute our judgment for that of the jury, for one reason: That we are not presented with the same state of facts and circumstances, and especially the physical and living facts which ordinarily should have some weight with the jury in passing upon an issue of this kind.

Finding no prejudicial error in the proceeding and judgment of the trial court, and under the rule which we believe to be sound and sustained by the weight of authority, and not feeling at liberty to interfere with the verdict of the jury as being excessive, the judgment of the trial court is affirmed.

All the Justices concur, except KANE, C. J., not participating.