(137 So. 398)

**SOUTHERN RY. CO. v. SMITH.**

**6 Div. 637.**

Supreme Court of Alabama.

Oct. 8, 1931.

Rehearing Denied Nov. 19, 1931.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

586

Ewing, Trawick & Clark, of Birmingham, for appellee.

**FOSTER, J.**

Plaintiff's intestate was the foreman of a bridge crew in the service of defendant engaged in interstate commerce. He was killed in a head-on collision between his motorcar and train No. 664, between stations Cordova and America Junction. The roadway between those stations was a "block," according to the system of defendant. America Junction was about five miles west of Cordova. The motorcar was traveling west from Cordova, train No. 664, east from America Junction, and the collision occurred nearly midway between them. There was a telegraph operator at each station. No. 664 was an engine operated as a train and so called, and was allowed by the operator at America Junction on orders from the dispatcher to follow train No. 62 into the block ten minutes later, both going east toward Cordova. Before leaving America Junction by train No. 62, the operator there had secured information from the Cordova operator that there was nothing in the block going west from there. This was about 1:46 or 1:48, whereupon train 62 started its course east in the block. At about 1:30 and before No. 62 was by America Junction, plaintiff's witness Stallworth, who was then the operator at Cordova, but who was discharged soon after the collision, testified that decedent came into his office at Cordova and asked him "to find out from the dispatcher if there were any trains between 62 and 58"; that he asked the dispatcher by telegraph if there would be any trains between 62 and 58, and he said there would be none; and that he communicated this information to decedent. They then discussed the question of whether 62 would reach Cordova by 2 p. m., so that if he left afterwards he could reach Parrish, his destination, before 58 reached there also going east behind 62. Deceased then ran his motorcar down the track to the end of the siding a mile or more, apparently to wait for 62 to come in, and then went on his course. At 1:56, ten minutes after 62 left America Junction going east, the operator at that station notified Stallworth at Cordova that 664 had entered the block, behind 62. Cordova station knew nothing of 664 until then, and the operator had not asked for clearance, but he permitted the entrance of 664 on orders of the dispatcher, which was permissible under the rules when there was another train in the same block going in the same direction, for the rules prohibited the operator at Cordova to permit a train going west until after 62 had passed, and he had received clearance from America Junction. So that the entrance of 664 into the block after 62 had gone in and before he had given Cordova a block clearance, and on orders of the dispatcher, was pursuant to the regulations. The motorcar of deceased proceeded west from the end of the switch, meeting 664, after 62 had gone by, and the collision occurred. As soon as the operator at Cordova learned of the approach of 664, he sent a telephone call, which automatically rang all the 'phone booths in the block, in order to stop decedent, or 664, if he could, but failed to get

word to either of them. The dispatcher denied that Stallworth had asked him about trains running between Nos. 62 and 58. But testified that he knew about No. 664 and gave the order for it to leave America Junction at 1:56, and that if Stallworth had asked him the question he would have told him about No. 664. So that, as to whether such messages passed, the evidence was in sharp conflict.

But defendant claims that Stallworth had no authority to make the request as he did, nor give it thus to deceased, neither did deceased have authority to make a request, except for written information. And that deceased should have requested a "written line-up" for his information. The meaning of this is thus explained by Stallworth:

"When a written line up was requested that would be in writing and signed by the chief dispatcher. That would be telegraphed to the operator with the dispatcher's name also telegraphed. When there is a message for a written line up, that actual message would come from the dispatcher; it would come telegraphed and I would copy it down like the dispatcher sent it. The message would also have affixed to it the signature of the chief dispatcher. He would telegraph his signature. It would have his name to it, and I would put it there of course. I would write down what the dispatcher told me, including the chief dispatcher's name, and in case of a written line up I would give that to Mr. Smith. I didn't do that on this occasion, and Mr. Smith didn't request any such line-up. As a matter of fact when I talked to the operator I just asked him what Mr. Smith asked me to ask him; I didn't tell him that that information was wanted for a line up. I didn't inform the dispatcher that the information I asked for was wanted for a line up for the motor car. As a matter of fact I didn't tell the dispatcher that Mr. Smith was at Cordova with his motor car," and continuing he said:

"The only way to get a line up from the dispatcher in writing was over the telegraph and I did that. * * * I got it the only way that I would have gotten it from the dispatcher, unless he put it in message form. If he put it in message form I would have written it out. * * * I wouldn't change the wording. * * * If there had been any writing I would have written it and if I had written it the same information would have been given Edward H. Smith the afternoon he was killed, that was given him."

And by Truss, the dispatcher, as follows: "He did not get any written line up from me. Written line ups are given in message form, written in the form of a message. That would be entered on the book not on the sheet. If it is a written line up we make a report. A train order is written up in the train order book. The difference between a train order

and a written line up, a train order is put on form 19 and form 31 and a number used for them, a written line up, as written out, looks like a message with no number on them. The written line up is written with no number. The train order directs the train to go to a particular point and proceed no further. A written line up carries the location of trains concerning that particular movement which he wants. In a written line up we merely give the movement of trains, of the time they are supposed to arrive there. A written line up is addressed to the man asking it. The written lineup comes to who ever wants it in the form of a message addressed to him and carries the location of trains supposed to be at stations at that time. The operator of a motor car is not given instructions to proceed to a given point and wait for trains, he uses that line up in proceeding himself. He can go forward to any point he want to go to. They are given directions for their movements. No written line up was gotten from me by Mr. Smith. I was the only man that could give a written line up for that part of the line Mr. Smith was on, and I didn't do it."

Defendant also claimed that the rules by which the operator and dispatcher were required to inform deceased as to the movements of trains were 5 and 6, which are as follows:

"5. The user of a car, working within restricted limits, before starting in or returning from work, or while the car is on main track, must take proper measures for safety, obtaining information in writing from train dispatcher when possible as to location of trains in that territory."

"6. A car which cannot be quickly removed from the track must be operated under train orders or under the protection of a flagman with proper signals.

"A car which can be quickly removed from the track by those on the car, may be operated under the responsibility of the user, who must when possible secure written information from the train dispatcher as to location of trains that may affect the movement of the car and secure additional information from time to time, and take such other precaution as may be necessary for safe operation. The information from the train dispatcher does not relieve the user of his responsibility for safe operation."

And circular 100, as follows: "Circular 100. "All Foremen:

"Effective at once, line ups given each of you by dispatcher are not to be used in operating your motor cars to and from your work. In the operation of motor cars, the Rule Book with reference to same is to apply in all cases.

"It has been brought to my attention that a number of our foremen are operating their

cars without flag protection, moving on the indication of the blocks, which will sooner or later get you in trouble:

"Please operate motor cars in accordance with Book of Rules."

Defendant's superintendent testified that: *"They have no authority to give oral information to motor car operators as coming from the dispatcher.* The operator asks the dispatcher for a line up for the motor car and he gives it in written form and makes a record of it in his office. *That is in message form and is addressed to the motor car.* In the case of a train order, it is addressed to the conductor and engineer on motor car so and so. The dispatcher sends the message to the operator addressed to the foreman in charge of the car signed by the chief dispatcher. Train orders are handled in the same manner. There is this difference between a line up and a train order. A copy of a train order is given to all parties to participate in the fulfilment of the order. The line up is only given to the foreman as information." (Italics supplied.)

■ The case was tried on counts 1 and 3, which charged the negligence in (1) to Stallworth, the operator, and in (3) to Truss, the dispatcher. If in fact Stallworth told deceased that he had asked the dispatcher if there was a train between 62 and 58, and was told that there was no such train, when in fact there was, and that information was the proximate cause of the accident, the jury could infer negligence, whether the operator asked the dispatcher or not, or received from him the erroneous information or not. If he did not, the operator was negligent; if he did, the dispatcher was negligent. But for defendant to be responsible for that negligence, such employees must have been acting in the line and scope of their employment in respect to giving such information. It is fairly shown that deceased and the operator and dispatcher were familiar with the rules. Deceased had been in the service for over forty years.

■ It is conceded that if deceased had requested the same information in the form of a written line-up, and that the dispatcher had telegraphed the answer in that form, and the same answer had been given deceased, in writing with the signature of the dispatcher, it would have been in the scope of their authority. The rule is that when an employee is engaged in the service of the master, the fact that the method of doing the work for which he was engaged is contrary to the rules does not ordinarily have the effect of placing the employee without the line and scope of his employment. This rule has been applied by this court to a plaintiff suing under the Federal Employers' Liability Act (45 USCA §§ 51–59), who was at the time violating a rule. Nevertheless he is said to be in the line and scope of his employment, unless he had departed from the character of service for which he was employed. Louisville & N. R. Co. v. Fleming, 194 Ala. 51, 69 So. 125. The rule is sometimes thus expressed: "If the act of the employee is committed in the course of his employment, although unauthorized or even forbiddden by the master, the master may be liable." 39 Corpus Juris 546. The text is sustained by the following cases: Cincinnati, N. O. & T. P. R. Co. v. Wilson's Adm'r, 161 Ky. 640, 171 S. W. 430; Chicago, etc., R. Co. v. De Vore, 43 Okl. 534, 143 P. 864, L. R. A. 1915F, 21; Lewis v. Mammoth Min. Co., 33 Utah, 273, 93 P. 732, 15 L. R. A. (N. S.) 439; Callahan v. Chicago, etc., R. Co., 161 Wis. 288, 154 N. W. 449; Dahlquist v. Denver & R. G. R. Co., 52 Utah, 438, 174 P. 833.

Under the Workmen's Compensation law an employee is held not to be outside the course of his employment merely because he is violating a rule pertaining to the method of its performance. Blocton Cahaba Coal Co. v. Campbell, 219 Ala. 529, 122 So. 806.

■ The complaint is not predicated upon a violation of the rules, though such rules may have been violated to the extent that the service for which complaint is made was not rendered pursuant to the method required by such rules. For there is evidence from which the jury could find that deceased would have been given erroneous information whether the rules had been observed or not, and they could have found that the same consequences would have resulted to deceased in either event. If so, defendant would be responsible for the proximate consequences of such error, unless relieved by virtue of some other principle.

■■ Defendant filed as a complete defense various special pleas alleging the assumption of risk by deceased by reason of his violation of certain rules of defendant. Plea 2 alleged the violation by deceased of rule 5, which we have quoted, in that though at the time he was subject to that rule, and could have easily complied with it, and have obtained information in writing from the train dispatcher, as to the location of trains, he failed to do so, and as a proximate consequence of the violation of the rule in this respect the collision occurred which resulted in his death.

We will not here discuss the question of whether the violation of the rule in the respect here alleged is properly classed an assumption of risk or contributory negligence. The court overruled demurrer to all the special pleas. It thereby held that they all set up proper matter of assumption of risk as a defense. This ruling was favorable to appellant, and therefore there was no reversible error in this respect whether the matter is properly called assumption of risk or contributory negligence. And if the evidence without conflict or adverse inference sustains any one of such pleas, defendant was due the

general charge, though the plea may not set up a good defense in bar of recovery. Upon the subject of whether such pleas are in their nature assumption of risk or contributory negligence, appellant's counsel have cited cases which would appear to be pertinent to at least some of the pleas. Frese v. Chicago, B. & Q. R. Co., 263 U. S. 1, 44 S. Ct. 1, 68 L. Ed. 131; Davis v. Kennedy, 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212; Great Northern R. Co. v. Wiles, 240 U. S. 444, 36 S. Ct. 406, 60 L. Ed. 732; Unadilla Valley R. Co. v. Caldine, 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224; Slocum v. Erie R. Co. (C. C. A.) 37 F.(2d) 42; Paster v. Penn. R. R. (C. C. A.) 43 F.(2d) 908; Chesapeake & O. R. Co. v. Dixon, 212 Ky. 738, 280 S. W. 93; Rowe v. Chesapeake & O. R. Co., 215 Ky. 525, 286 S. W. 784; Dozier v. Missouri Pac. R. Co., 176 Ark. 651, 3 S.W.(2d) 678.

■ We think that defendant was not due the affirmative charge on plea No. 2, because it was open to the jury to find that the proximate cause of the collision was the erroneous information, and not that it was not obtained in writing. The evidence has a tendency in one aspect to show that he sought and obtained the exact information referred to in this plea. If so, and if it was erroneously given him by those whose duty it was to give it to him upon request by him that it be in writing, the jury could find that it was the negligence of the operator or dispatcher in misinforming him, and not his failure to obtain it in writing, which proximately caused the result.

■ Plea 3 alleged that defendant assumed the risk of the collision because he violated the first paragraph of rule 6, as we have copied that rule, in that his motorcar could not be quickly removed from the track within the meaning of that rule, and was not operated by him, who was in charge of it, under train orders, or the protection of a flagman with proper signals.

We think that a sufficient answer to the claim that defendant was due the affirmative charge on this plea is that the jury could find from the evidence that the motorcar of deceased was one which could have been quickly removed from the track, and therefore that the second paragraph of that rule applied to it.

■■ In plea 4 defendant set up a violation of both paragraphs of rule 6 by alleging that it was not operated under train orders or the protection of a flagman with signals as required of a motorcar which cannot be quickly removed from the track, nor did deceased secure written information from the train dispatcher as to the location of trains. Likewise we say that though the evidence shows that the motorcar was not operated under train orders nor under the protection of a flagman, nor did he obtain information in writing as to the movements of trains in that vicinity, it does not appear without adverse inference that the motorcar could not be quickly removed, or that, if it could, the failure to secure the information in writing rather than by verbal communication was the proximate cause of the collision. Again we have in this respect a jury question.

■ Plea No. 5 alleged a violation of rule 7, which is as follows: "The user of a car must have in his possession copy of current time table and a standard watch with correct time. He must observe passing trains for signals displayed. He must observe the indication of block signals but they do not relieve him of responsibility for safe operation. He must assign one or more employés, when available, to keep vigilant lookout in both directions for trains, other cars and for persons, vehicles, animals or other obstructions, and assign station and duties to each person to be followed when removing the car. When the view is obstructed by fog or curvature or when other adverse conditions prevail the movement must, if necessary, be protected according to Rule 99 by a flagman with proper signals."

The breach alleged is his failure to assign an employee to keep a lookout in either direction for trains, and as a proximate consequence of such violation the collision occurred. But the evidence shows that the collision occurred in a cut on a curve, from which the jury could infer that such lookout would not have prevented the collision, and the evidence further shows that deceased and at least some of the employees on the motorcar were in fact keeping such lookout, though they may not have been specially assigned to that duty on that trip, and that there were general orders by deceased to that effect.

■ Plea No. 6 alleged the existence of circular order 100, which we have quoted, and alleged deceased's knowledge of it, and its violation in that deceased obtained from the operator at Cordova oral information as to the location of trains, and was undertaking to operate said motorcar upon the faith of said oral information; and, further, that defendant then had in operation a rule which required a motorcar which could not be quickly removed from the track to be operated either upon train orders, or under the protection of a flagman, and that said motorcar was not being operated under train orders, or the protection of a flagman, and in violation of both the order (100) and the rule; that such violation proximately caused the collision and death of plaintiff's intestate.

The meaning of order 100 is somewhat obscure. It prohibits the use of a "line up" in operating cars to and from work, but enjoins the use of the rule book which provides for a written line up when possible (rule 6) and particularly before starting in or returning from

work (rule 5). But this plea alleges, as we have shown, that it is predicated upon the breach of this order by reason of the operation of the car upon the faith of an oral "line up," and also upon the breach of a rule pertaining to motorcars which could not be quickly removed requiring their operation under train orders or the protection of a flagman. While the plea does not allege, as it should to make the latter rule applicable, that the motorcar of deceased was one which could not be quickly removed, it was necessary to prove that fact in order that the rule should apply to it. We have shown that this was a question for the jury under the evidence, and in order to sustain that plea the evidence must show a violation of both the order 100 and the rule mentioned.

We find that the issues made on counts 1 and 3 and on the special pleas were properly submitted to the jury, and there was evidence which, if believed by the jury, was sufficient to support the verdict. Therefore the affirmative charge for defendant was properly refused.

■ Assignments of error 1, 2, 3, 4, 5, and 6 each relate to the action of the court in overruling defendant's objections to certain questions propounded by plaintiff's counsel to the witness Jake Johnson upon redirect examination. Upon cross-examination this witness testified in detail to the custom on the part of the deceased to protect the car which he was using at the time he was killed, with a flagman, and that two members of his crew, Henry Williams and Jim Ford, usually did the flagging under the instructions of the plaintiff's intestate. Upon redirect examination the plaintiff's counsel sought to show by the witness that the custom of flagging was limited to occasions on which the deceased did not have a line-up. The questions along this line are made the bases of the several assignments of error referred to. The witness did not testify on cross-examination as to the general custom to protect motorcars by flagmen, but only to the custom of the deceased. The questions, the bases of the several assignments, are likewise limited to the custom of the deceased.

It may be conceded that plaintiff should not be permitted primarily to show his own custom in respect to the rules of his employer, and yet if defendant on cross-examination of a witness brought out such fact, plaintiff could, upon well-known rules, on · redirect, elicit further testimony from the same witness on the same subject. Such is conceded by appellant's counsel in brief to be the condition of the record as to the above-noted assignments. They show no reversible error.

■ Assignments of error 38, 39, 40, 41, 42, 43, 44, 45, and 46 relate to the action of the court in overruling defendant's objections to various questions propounded to the witness Henry Williams, seeking to prove that it was not the custom of plaintiff's intestate to flag his motorcar when he had gotten orders that the road was clear, or when he had gotten orders or instructions from the station agent that the road was clear, or when he understood the road was clear, etc.

It will be recalled that defendant proved on the cross-examination of Jake Johnson that it was the custom of deceased to protect his car with a flagman. On direct examination of this witness Henry Williams on questions by defendant, he testified to the custom of deceased in flagging his motorcar for approaching trains. The questions by plaintiff on cross-examination referred to in the above-numbered assignments elicited evidence that such custom was observed only when deceased had not received information from the station agent that the road was clear, or when he had no line-up. If it is sought by defendant to show an interpretation by deceased of the rule to require him to flag his car, showing it to be one which could not be quickly removed, and that such interpretation was manifested by his custom to flag, certainly he could explain such custom on his part by showing that he did not flag when he had information that the block was clear. Though this may not be proper as primary evidence, it certainly was in rebuttal of that introduced into the case by defendant.

As to assignments of error Nos. 21, 22, 23, 24, and 25: Assignment of error No. 21 relates to the action of the court in overruling defendant's objection to the following question propounded to the witness S. P. Stallworth: "I will ask you if it was customary. I will ask you if it wasn't customary to come and get a line up just as Mr. Smith did?" To which question the witness replied: "It was customary for men on motor cars to get that information to get that information just as he did, and it was customary for me to give it just as I gave it." Counsel for plaintiff then propounded to the witness the following question: "I will ask you if that wasn't the custom existing up to the time of Mr. Smith's death?" The witness answered: "Yes, sir." Counsel then asked the witness the following question: "You got it the only way you could get it, did you not?" And his answer: "I got it the only way that I would have gotten it from the dispatcher, unless he put it in message form. If he put it in message form I would have written it out." He then propounded the following question to the witness: "But that would have been a difference in form, wouldn't it?" And his answer: "It wouldn't change the wording." The overruling of defendant's objection to these questions is the basis of assignments of error 21, 22, 23, 24, and 25, respectively.

■ The question of plaintiff's contributory negligence being only in mitigation of dam-

591

ages, it is not necessary to plead it specially. Mobile & O. R. Co. v. Williams, 221 Ala. 402 (22), 129 So. 60, and cases cited. But the damages should be "diminished by the jury in proportion to the amount of negligence attributable to such employee." Federal Employers' Liability Act § 3 (45 USCA § 53).

█ If it has been customary for employees to violate a rule, and such custom has been so extensive and persistent that it may be inferred that it was known to the employer who acquiesced in its breach, it may have the effect of waiving it. Louisville & N. R. Co. v. Richardson, 100 Ala. 232, 14 So. 209; St. Louis, etc., R. Co. v. Martin, 165 Ark. 30, 262 S. W. 982, 984; St. Louis, etc., R. Co. v. Stewart, 124 Ark. 437, 187 S. W. 920.

█ Stallworth testified that the information as sought by deceased was that, "He asked me to find out from the dispatcher if there would be any train between Cordova and Parrish between trains 62 and 58." And though he did not ask for the information to be in writing, he did not ask for it to be given otherwise. So that pursuant to his request, he could have expected a written line-up, if the rules required it. But when it was not thus furnished him, his acceptance of that method of giving him a line-up is somewhat mitigated in degree of culpability by a custom then in existence though not approved or ratified by defendant. So that we cannot agree that it was reversible to admit evidence of such custom.

█ Assignments of error 30, 31, 32, 33, 34, and 36 relate to the action of the court in overruling defendant's objections to questions propounded to trainmen relating to train 664, which collided with the motorcar, inquiring whether the whistle was blown or the bell rung, the speed of the train around the curve, and whether the train was being operated at such rate of speed as to be able to stop short of an obstruction.

Count 2 of the complaint charged the negligence to the operation of the train which was No. 664. That count was withdrawn on the day of the trial. The record does not show whether before or after the taking of the testimony. The evidence referred to in the above-numbered assignments was admissible under count 2. Rule 15 provided that when a train is.allowed to enter a block behind another one in the same block, going in the same direction, the one behind the other "may proceed with caution to the next block station in advance, prepared to stop short of any obstruction in the block." Train 664 was apparently being operated under that rule. The evidence was relevant to that issue.

█ We have already observed that the contributory negligence of deceased was relevant on the question of damages, and the signals, noise, and speed of the approaching train which was in the collision was relevant on the culpability of the negligence of deceased, if not the fact of such negligence, when it is remembered that the view of the train as it approached was obstructed. We do not think there was reversible·error shown by those assignments.

██ Assignments of error 55 and 56 relate to the action of the court in overruling defendant's objections to questions propounded by plaintiff's counsel to witness J. W. Payne. Assignment of error 55 relates to the action of the court in overruling the defendant's objection to the following question: "Now, Mr. Payne,· you·said at the time, * * * you fired·Mr. Stallworth because of this accident, didn't you?" Assignment of error 56 relates to the action of the court in overruling defendant's objection to the following question propounded to the witness J. W. Payne: "You fired Mr. Stallworth immediately after this accident, didn't you?"

The first question was not answered. To the second he said that he suspended Stallworth two days after the accident, pending his investigation, then discharged him in about ten days. The witness was the superintendent of defendant, and Stallworth had testified as a witness for plaintiff, and was the operator at Cordova who had given deceased the so-called line-up. The objection was based upon general grounds. The superintendent and Truss, the dispatcher, had both testified at material variance with that of Stallworth on matters vital to plaintiff's recovery, and respecting the conduct of Stallworth. If the superintendent had, after investigation, discharged Stallworth, that fact cannot be said to be irrelevant as affecting the conflict in their testimony. It had a tendency to show the animus toward each other of the respective parties to that conflict. This was on cross-examination of the superintendent, and related to his conduct as ·such respecting the transaction. Under such circumstances, there is a wide latitude in the discretion of the court. We do not hold that it was admissible as material primary evidence of the negligence of Stallworth, or that the superintendent so regarded his conduct. 45 Corpus Juris, 1232; Alabama Great Southern R. Co. v. Ensley Transfer & Supply, 211 Ala. 298, 100 So. 342; 39 Corpus Juris 1035.

█ Appellant's counsel have misconceived the questions referred to in assignments 58 and 59. They were propounded by defendant to its witness as to whether he would have fired deceased if he had not been killed. Appellant's counsel argue correctly that such testimony is not admissible, and the court so held. But defendant did show that the conduct of deceased was ·a dischargeable offense.

█ We think that refused charge 44 is misleading in its tendency. Moreover, the

592

operator at Cordova did not undertake to give information as to the trains, but only undertook to convey to the deceased information claimed to be given by the dispatcher. Again, the charge does not direct the jury in respect to its effect upon the issues in the case. Johnson v. Louisville & N. R. Co., 220 Ala. 649, 127 So. 216, 217.

Refused charges 27, 18, 19, 17, 29, and 28 are all controlled by principles as to which we have expressed our views. They were properly refused if we have correctly applied those principles.

 Charges 46 and 37 do not relate to an issue formulated by the complaint, counts 1 and 3, nor any special plea. The rules relied upon in each plea are set out in them. The charge is vague as to what rules are referred to. Besides, the violation of a rule does not necessarily assume the risk of the negligence of defendant's servants, irrespective of the nature of the rule, though the violation of some rules may under some circumstances be so treated.

We cannot agree with appellant that denying the motion for a new trial was reversible error.

Affirmed.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.