## Case No. 10,572.

### The ORIFLAMME.

[3 Sawy. 397; 1 2 Am. Law T. Rep. (N. S.) 381; 7 Chi. Leg. News. 347; 2 Cent. Law J. 478; 2 Int. Rev. Rec. 237.]

District Court, D. Oregon. June 30, 1875.

CARRIERS OF PASSENGERS — PASSENGER ENTITLED TO BERTH — STEERAGE PASSENGER — FREIGHT IN STEERAGE — DISFIGUREMENT OF PERSON — DAMAGES FOR.

1. Common carriers of passengers are bound to use extraordinary care and diligence, and are excused only by reason of force or pure accident.

2. An undertaking to carry a passenger in the steerage of a steamship from San Francisco to Portland includes the furnishing of such passenger with a berth. unless there is a fair understanding to the contrary.

3. A steerage passenger is entitled to the use of the steerage room to walk about or sit down in during the voyage. without the risk or inconvenience of freight therein: but if freight is stowed therein it is at the risk of the carrier, and it is his duty so to stow and secure it that no harm will be caused to the passengers by it: nor can the carrier impose any arbitrary regulation upon the passengers with a view of diminishing such risk—such as to remain in their berths during the whole voyage, or any unusual portion of it.

4. Where a number of boxes of tin were stowed in the after part of the steerage, so as to make a pile six feet in length. three feet in width, and from five to eight feet in height. without any means of preventing the top tiers from sliding off on the floor in case of rough weather; and a steerage passenger sat down by the side of said pile. and was injured by the rolling of the ship causing some of the boxes to fall upon her: held. that the stowing of the tin in the manner in which it was done was gross negligence. and the carrier was liable to the passenger in damages for the injury.

5. Disfigurement of the person caused by such an injury is a proper subject of damages. but in estimating them it is proper to consider the condition and circumstances of the party disfigured.

[Cited in Heddles v. Chicago & N. W. Ry. Co., 77 Wis. 231, 46 N. W. 115.]

In admiralty.

John W. Whalley and M. W. Fechheimer, for libellants.

Joseph N. Dolph, for claimant.

DEADY, District Judge. This suit is brought by the libellant, Ernestine Koch, to recover $3000 damages for injuries to her person, caused by the negligence of the respondent and claimant. the Oregon Steamship Company, while engaged in transporting her in the steerage of the steamship Oriflamme, from San Francisco to Portland. It is substantially alleged in the libel, that a number of boxes of tin were so negli-

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

gently and insecurely stowed in the steerage, that the rolling of the ship caused some of them to be thrown on the libellant, whereby she was greatly injured and disfigured.

The respondent admits the contract to carry the libellant, and that she was slightly injured during the voyage. but alleges that the boxes of tin were securely stowed in the steerage; that the libellant was furnished with a berth and directed to remain in it while crossing the San Francisco bar and during rough weather; but that the libellant left her berth and negligently sat down by said pile of tin, upon some packages of baggage belonging to the steerage passengers, when the motion of the ship caused said packages to roll from under her, and ·"she was thereby thrown upon the floor of the steerage and one of said packages of baggage was rolled against the libellant, and she was thereby or by being precipitated against the standard, supporting the berths, sligthly bruised."

In addition to the libellant, ten witnesses from among the steerage passengers, were examined on her behalf as to circumstances of the alleged injury. They were all Germans, but had no particular acquaintance or relation with the libellant. and so far as appeared, testified fairly and without prejudice.

For the respondent three witnesses were examined in relation to such circumstances, namely, the steerage steward, the porter and the second mate. All these witnesses belong to the ship, and testify under circumstances calculated to induce them to speak as favorably for the respondent as possible. Particularly is this the case with the mate, who is responsible for the manner in which the tin was stowed, and the steerage steward, whose duty it was to provide the libellant with a berth, if possible. The steward's testimony is not consistent with itself, and is in direct conflict on material points with that of other witnesses, who appear to be credible. He states that the pile of tin was not more than eighteen inches high, and that he gave libellant a berth. which she declined to occupy. The second mate says the pile was from twenty-two and a half to twenty-five inches high, and contained four tiers of boxes. The porter's testimony is silent as to the height of the pile prior to the accident. The men who stowed the tin, under the direction of the mate, were not called by the respondent, nor their absence accounted for. Neither was the chief steward, although he appears to have been in the steerage, assisting in taking care of the libellant immediately after the accident.

The libellant and six of the steerage passengers swear positively that the pile was upwards of five feet high, and the others state the circumstances concerning the casualty, which strongly tends to prove the truth of this statement. For instance, if the pile of tin was only eighteen inches or two feet high, it is impossible that these passengers could have found the libellant on the floor, with some of the boxes of tin on top of her, as they testify they did, unless the ship had turned upside down.

I find the facts to be as follows: The libellant, a respectable German servant girl, of nineteen years of age, on March 20, 1875, at San Francisco, while emigrating from Germany to Oregon, took passage on the respondent's steamship—the Oriflamme—for this port. The family with which she lived in Germany were cabin passengers on the same vessel, and had procured her a steerage ticket for fifteen dollars.

The libellant could not speak English, and the steward in charge of the steerage could not speak German. Several of the passengers appear to have been without berths or sleeping accommodations of any kind. No berth was assigned to the libellant, nor was there any vacant one which she might have occupied, except a lower one, which was in an unfit condition.

In the afterpart of the steerage a number of boxes of tin, weighing about one hundred pounds each, were stowed against the bulkhead, dividing it from the freight-room, making a pile of about six feet across the vessel, three feet fore and aft, and from five to eight feet high. The pile was somewhat in a pyramidal form—sloping back toward the bulkhead and center from the lower tiers or base. Cleats were put around the base of the pile, to keep it from shifting bodily, but there were no means taken to keep the upper tiers in their place, or from slipping off the pile. Around the base of the pile was stowed a number of carpet-sacks, hand-trunks and bundles belonging to the steerage passengers.

The ship left the dock between ten and eleven o'clock a. m., and the libellant, at the suggestion of some of the Germans in the steerage. placed her carpet-sack at the end of the pile on the starboard side of the ship, and sat down on it. Somewhere about one o'clock of the same day, between the San Francisco bar and Point Reyes, and about five or six miles north of the bar, while the vessel was going at usual speed, with a heavy swell on her side, she rolled so far over to starboard, that several of the boxes of tin slipped off the top of the pile, and struck the libellant on her head and right shoulder and threw her forward on her face. Some of the passengers immediately ran to her assistance, when they found her stunned or fainted away, while the carpet-sacks, hand-trunks and boxes of tin were lying around her, and some of the latter on her body and legs. They immediately removed the boxes and drew her from among them. Word of the accident was at once sent on deck, and the steerage steward and the porter—the latter of whom could

speak German—came down and took charge of the girl. Her face was covered with blood from a contused cut to the bone, on the forehead, over the right eye, and about one inch in length. Her right shoulder and arm were badly bruised as were also her legs—and particularly one of her ankles. After cleansing her face and binding up the wound on her forehead, they placed her in a berth in the steerage, where she remained without any other care or attention, so far as appears, until the next day, when she was removed to the lower or servant's cabin in the after part of the vessel, and placed in a berth, where she remained until she reached Portland and left the vessel.

The medical experts are of the opinion that the bone was not injured by the wound on the forehead, although it may have been. It is not yet healed. For some reason, not satisfactorily explained by the testimony, the wound does not heal, and still suppurates. At times the libellant suffers severe pain in the head on account of it, and cannot do labor which requires her to exert herself by lifting or stooping. Still, it is not probable that any permanent injury will result from the wound. But she received a very severe shock of the brain, and came very near losing her life. The scar resulting from the wound will be permanent, and somewhat disfigure the libellant. It will be about three-quarters of an inch in length, one-third of an inch in greatest width and irregular in outline. The arm and lower limbs are recovered from the bruises.

The libellant does not appear to have been visited by the master of the ship after the accident, or to have received any medical attendance, or special care or nursing. She was lying in the berth on her back, probably in a partially comatose or delirious state, most of the time, until she reached Portland. During this time, she was visited occasionally by the stewardess and porter, but took no food or nourishment, and did not change her clothing. She was able to walk when removed from the steerage to the lower cabin, with the assistance of a person on either side, and walked to a house near by when she left the ship at Portland; but she was confined to her bed for some days afterward, during much of which time she had fever and was delirious. Within two weeks after her arrival in Portland, she went into service in a family in the city, where she still remains, but is not yet able to do a woman's work on account of her head.

Upon this state of facts, there can be no doubt as to the liability of the respondent. In Shear. & R. Neg. § 266, the rule in regard to carriers of passengers is laid down as follows: "Out of special regard for human life, and acting upon the presumption that every man who commits his person to the charge of others expects from them a higher degree of care for his bodily safety than they would bestow upon the preservation of his property, the law very wisely exacts from a carrier of passengers for hire the utmost care and skill which prudent men are accustomed to use under similar circumstances."

There does not appear to have been any special contract that the libellant was to be furnished with a berth during the voyage, nor has it been shown that there is any statute of the United States applicable to the subject. For although, on this occasion, the Oriflamme sailed from a "port in the United States," to a port "on a tributary of the Pacific Ocean," and is therefore within the letter of section 4205 of the Revised Statutes, I cannot think she was within the spirit of it or within the contemplation of congress when the act was enacted. Still, I think the undertaking to carry a passenger, either in the steerage or cabin, between the ports of San Francisco and Portland, ought to be construed to include the furnishing of such passengers with a berth, unless there was a fair understanding beforehand that the passenger was to make the voyage without it; and this is particularly so in the case of a female passenger traveling alone. The want of a statute of the United States imposing a penalty upon the carrier for not furnishing berths upon this route, does not affect the question of whether he is bound to do so by his undertaking or not. Such an omission only proves that congress has not yet seen proper to secure the performance of the contract of the carrier in this respect, by the imposition of a penalty for non-performance. And this seems to have been the theory of the matter upon which the answer of the respondent was framed, for, as has been stated, it is therein alleged that the libellant was furnished a berth.

There was then, negligence upon the part of the ship in not furnishing the libellant a berth. But it does not necessarily follow that this negligence was the cause of the injury received by the libellant. It might have happened, as it did, even if the libellant had been furnished with a berth; for she was not bound to stay in it. She had a right to be up and about in the steerage, if she was able and so inclined, and it was the duty of the respondent to keep the steerage-room a safe place for her to walk about or sit down in, so far as the utmost care and skill of a cautious, prudent person would provide under like circumstances.

Ordinarily, the steerage passengers are entitled to the use of the steerage-room, free from the risk or inconvenience of freight therein. Cases may arise in which the passengers are so few in number in proportion to the size of the room, that there can be no objection to some portion of it being used as a freight-room. But in such case,

the carrier takes the risk, and it is his duty to so stow and secure such freight that the passengers will not be injured by it; nor can he require them to obey any arbitrary regulation with a view of diminishing such risk—for instance, to remain in their berths during the whole voyage or any unusual portion of it.

It is not satisfactorily shown what number of steerage passengers were on board the Oriflamme on this voyage. The steerage steward says he thinks there was sixty or seventy of them. Nor is there any evidence as to the size of the steerage-room. But under any circumstances the stowing of this tin in the steerage, in the manner in which it was done, was gross negligence on the part of the respondent. It was the direct cause of the injury received by the libellant, without any fault or contributory negligence on her part. She had a perfect right to sit down by the side of the pile, unless she knew it was dangerous or was duly warned to avoid it. But she was not so warned, nor can it be claimed under the circumstances that she was aware or had good reason to know of the danger. Apparently it was the most convenient and secure place in the room, of which she could avail herself, to sit or lie down and be out of the way of the crowd, to whom she was a stranger.

The libellant claims $3000 damages for the injuries received and expenses incurred on account of them. For everything beyond the actual expense and loss of time incurred on account of the injury, the damages can only be estimated in a general way. In making this estimate regard must be had to the condition in life and the circumstances of the parties. Hanson v. Fowle [Case No. 6,042]. The respondent is a corporation, engaged in transporting passengers and freight between this port and San Francisco. It is the owner of the steamship Oriflamme, but of what other property, if any, does not appear. The libellant, as has been stated, is a servant girl, an immigrant from Germany, and about nineteen years of age.

I find that she is entitled to recover for expenses of her sickness and injury to her clothing, $100; for the loss of time and labor on account of the injury, $100; for the expense of employing counsel to maintain this suit to recover the damages to which she is entitled, $300; for the physical and mental pain and suffering caused by the injury and treatment of the libellant while on board the vessel after the accident, $1000; and, for the permanent disfigurement of the libellant's face from the wound on the forehead, $500. It may be that the sum of $500 is an insufficient compensation for such a blemish upon the personal appearance of the libellant. But it does not appear that the scar will affect her personal appearance, so as to make her presence offensive or painful to others. For this reason it is not likely to interfere with or prevent her from obtaining employment in her calling and sphere of life. It will in no way affect her ability to labor and earn her living. In manners and appearance, she is a plain girl, moving in an humble walk in life, and not like many others, dependent upon her beauty for her dowry or support.

Still the scar will be a permanent disfigurement of her person, for which she is entitled to some compensation. Karr v. Parks, 44 Cal. 49. In this country, at least, it is still open to every woman, however poor or humble, to obtain a secure and independent position in the community by marriage. In that matter, which is said to be the chief end of her existence, personal appearance, comeliness—is a consideration of comparative importance in the case of every daughter of Eve.

Let a decree be entered for the libellant for the sum of $2000 in lawful currency of the United States and the costs of suit.