## MUSKOGEE ELECTRIC TRACTION CO. v. WIMMER.

No. 8906—Opinion Filed Jan. 20, 1920.

Rehearing Denied Dec. 14, 1920.

(Syllabus by the Court.)

### 1. Negligence—Questions for Court and Jury.

In the cases involving the question of primary negligence, the rule is now settled that when a given state of facts is such that reasonable men fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered one of law for the court.

### 2. Damages—Personal Injuries—Loss of Eye—Excessive Damages.

It would be impossible to recount all the factors which enter into the common and general notions of what is fair and just as a basis to measure the damages for personal injuries. There can be no absolute standard to measure such damages, and a wide latitude of discretion is necessarily left to the good sense and discretion of the jury which fixes the award. And, in an action for personal injury, a verdict will not be set aside for excessive damages unless it clearly appears that the jury committed some gross and palpable error, or acted under some improper bias, influence or prejudice, or has totally mistaken the rules of law by which damages are regulated. Held, that a verdict of $7,833, awarded a motorman upon a street car, who was also 33 years of age, for the loss of an eye, where the injury necessitated its removal, is not excessive.

### 3. Same—Elements of Damage—Instruction.

In a personal injury action in which the plaintiff suffered the loss of the sight of an eye and the same was removed from its socket, the court instructed the jury that one of the elements of injury entering into his damages was the inconvenience of going through life with one eye and such anguish

as he had suffered and would continue to suffer by reason of the mutilation of his face and the fact that he might become an object of curiosity and ridicule among his fellows. Held, not error.

### 4. Appeal and Error—Review—Conflicting Evidence.

Where the verdict of a jury is based on conflicting evidence, the same will not be disturbed on appeal, but the rule is well established in this jurisdiction that there must be evidence reasonably tending to support the verdict of the jury, and that a conflict of evidence is such conflict that reasonable minds might reach different conclusions.

### 5. Same—Verdict—Sufficiency of Evidence.

In a civil action triable to the jury, where there is competent evidence reasonably tending to support the verdict of the jury, and no prejudicial errors of law are shown in the instructions of the court, or its ruling on law questions presented during the trial, the verdict and finding of the jury will not be disturbed in appeal.

Error from District Court, Muskogee County; Chas. G. Watts, Judge.

Action by Charles U. Wimmer against the Muskogee Electric Traction Company. Judgment for plaintiff, and defendant brings error. Affirmed.

B. B. Blakeney and J. H. Maxey, for plaintiff in error.

J. E. Wyand, A. F. Molony, C. A. Ambrister, Jess W. Watts, and B. Broaddus, for defendant in error.

JOHNSON, J. This was an action for damages for personal injuries claimed to have been received by the plaintiff below, who is defendant in error in this proceeding, while in the employ of the defendant below, the plaintiff in error here, as a motorman on an electric freight car. The parties will be referred to as they appeared in the trial court.

The action was commenced on the 7th day of January, 1916. On the 15th day of April, 1916, the plaintiff asked and was granted leave to file an amended petition, in which, for his cause of action against the defendant, he alleged:

That on the 14th day of August, 1915, plaintiff was regularly in the employ of said defendant as a street-car motorman, and as such was in charge of the operation of a certain electric freight car, owned and operated by said defendant, the same being numbered 32; that among other duties at the time enjoined upon the plaintiff, as such employe, by the defendant, it was plaintiff's duty to work upon and make repairs to said electric freight car and the appliances and appurtenances thereto attached as the

occasion required, as far as plaintiff was able to do; that on the 14th day of August, 1915, while in the performance of his duty as such employe plaintiff was engaged in taking out and replacing a certain air pipe connected with an air compressor attached to and suspended under said freight car and running to a certain air tank or reservoir, also attached to and suspended from said freight car, and while so engaged it became necessary to remove broken pieces of the threaded end of said air pipe which was screwed into the end of said air tank, and that while plaintiff was so engaged in attempting to remove the said broken end of said air pipe, being assisted at the time by one Albert Williams, who was at said time a servant and employe of the defendant, and whose duty it was to assist in making such repairs, and while plaintiff and the said Williams were in the proper discharge of their duty, one Burley E. Long, who was then and there employed by defendant as its master mechanic and foreman with full power and authority to superintend and direct all necessary repairs to the rolling stock of defendant, including said electric freight car, No. 32, directed the plaintiff to stop, for the time being, his efforts to remove said broken end of pipe aforesaid, and the said Long thereupon assumed charge of said work, and under the direction of said Long he was assisted by the said Albert Williams; that the said Long and the said Williams thereupon attempted to remove said broken end of pipe aforesaid by driving a cold chisel into the opening of said pipe as tight as the same could be driven, and after doing so applied a pipe wrench to said cold chisel and both the said Long and the said Williams applied their joint strength in attempting to twist said cold chisel so driven into the broken end of said pipe and thereby loosen and unscrew said broken piece of pipe so that the same could be removed; that said wrench was provided with teeth or sharp points for the purpose of cutting into round pipe or soft iron, lead, or other soft material, so that the same could be twisted or turned, and that said wrench and the teeth thereon were of hard, brittle steel; that said cold chisel was also of hard steel and was not round, but had sharp edges at the point where said wrench was applied as aforesaid; that when the said Long and the said Williams attempted, by the use of said wrench applied as aforesaid to said cold chisel, to turn or unscew said broken piece of pipe, the teeth or sharp points on said wrench being so strongly applied to said cold chisel and against the sharp edges thereon, one of the teeth on said wrench broke and such broken piece flew and struck plaintiff in the left eye, injuring the plaintiff as hereinafter stated; that at the time the plaintiff was struck he was standing a short distance from the said Long and said Williams waiting, under the direction of the said Long, to assist in making repairs on said car; that the said cold chisel and wrench

were wholly unsuited for the use to which the same were being put by the said defendant and its employes aforesaid, as the same were being used by the said Long and the said Williams as aforesaid; that the said wrench and the said cold chisel were not intended to be used together as the same were being used at the time the plaintiff was injured; that the method used by defendant and its servants, Long and Williams, in attempting to remove said piece of broken pipe by means of said cold chisel and wrench aforesaid was not reasonably safe, and defendant carelessly and negligently failed to provide a reasonably safe method for such work; that the defendant and its employes, Long and Williams, were careless and negligent in the use of said wrench and said cold chisel as the same were being used at the time plaintiff was injured as aforesaid; that the said Long and the said Williams were acting within the scope of their employment at said time and that the plaintiff's said injuries were due directly and proximately to the carelessness and negligence of the defendant, its servants and employes in the manner aforesaid, and that plaintiff at the time was in the exercise of due care for his own safety; that when said broken piece of said wrench struck the plaintiff as aforesaid, it penetrated the plaintiff's left eye and thereby destroyed the sight of same, and as a result thereof it became necessary for the plaintiff to have the said eye removed, and that plaintiff has thereby fully lost the vision of said left eye; that the said injury and consequent removal of plaintiff's left eye has greatly weakened and impaired the vision of plaintiff's right eye, and that all of plaintiff's said injuries are permanent; that plaintiff has suffered great physical and mental pain and inconvenience as a result of said injuries, and will continue so to suffer during his entire life; that at the time plaintiff was so injured, he was a strong, able-bodied man, 33 years of age, and engaged as an electric motorman and switchman, earning and capable of earning $100 per month; that plaintiff has been unable to perform any manual labor or earn any money whatsoever since he was so injured as aforesaid, and that said injuries have greatly impaired his capacity to labor and earn money in the future, and that by reason of said injuries, received as aforesaid, plaintiff has been damaged in the sum of $10,000. Wherefore, plaintiff prays judgment against the defendant for the sum of $10,000 and costs.

The defendant answered by general denial, and for further defenses alleged in its answer contributory negligence on the part of the plaintiff and the assumption of risk by him. The plaintiff's reply was a general denial.

The action was tried on these pleadings on the 17th day of October, 1916, and the jury returned a verdict in favor of the plaintiff for $7,833, and on this verdict a judgment was entered accordingly.

Proceedings in error to reverse the judgment were commenced by the defendant filing its petition in error in this court on February 8, 1917, with case-made attached.

The defendant's petition contains nineteen assignments of error: 1st, the court erred in admitting evidence over the objection of the defendant; 4th, in overruling the defendant's motion for an instructed verdict; 5th to 13th, inclusive, in giving certain designated instructions to the jury; 14th to 19th, inclusive, in refusing to give certain designated requested instructions of the defendant to the jury; 2d and 3d, in admitting evidence over the objections of the defendant.

We will first consider the defendant's 4th assignment of error, which is the overruling of defendant's request for an instructed verdict. In the case of Dickinson, Receiver, et al. v. Whitaker, 75 Okla. 243, 182 Pac. 901, in syl. par. 2, of the opinion, it was said:

"In cases involving the question of primary negligence, the rule is now settled that when a given state of facts is such that reasonable men fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men draw the same conclusion from them that the question of negligence is ever considered one of law for the court."

To the same effect, Wichita Falls & N. W. Ry. Co. v. D. Cawley Co. et al., 69 Oklahoma, 172 Pac. 70; Phinnie et al. v. Atkinson, 72 Oklahoma, 177 Pac. 111; Gwinnup v. Walton Trust Co., 69 Oklahoma, 172 Pac. 936.

The undisputed evidence of the plaintiff conclusively shows that the plaintiff received the injuries described in his petition precisely as alleged therein. He testified that as a result of said injury he had suffered great physical and mental pain, and that his other eye was thereby impaired and greatly weakened and caused him great physical and mental pain, and he would continue to suffer physical and mental pain for the remainder of his life, and that prior to said injury he was a strong, able-bodied man, 33 years of age, and capable of earning $100 per month. His life expectancy was 32½ years, as shown by American Mortality Table. This testimony was admitted without objection, and no testimony was offered to dispute the same.

The testimony disclosed by the record shows that the defendant's car barn, where its cars were stored, was excavated to a depth from four to five feet, and that twelve tracks were constructed over such excavation into said barn, and that a space of about three feet between the tracks was floored on a level with the top of the rails of the tracks; that the freight car upon which the plaintiff was motorman was supplied with air brakes, and that an air tank was suspended underneath the bottom of the car outside of the wheels, and that the same was connected with the air compressor by an inch pipe screwed into the end of the air tank. This freight car was used for hauling freight and switching the passenger cars of the defendant.

The plaintiff testified that he had operated the car the day before the injury, and on the afternoon or evening thereof, while operating the same over the lines of the defendant, it had become derailed; that he succeeded in getting the same upon the track and delivered it at the barn at about 10 p. m., and on the next morning ran the car over the pit in the barn and began making repairs of the damaged portion thereof caused by the derailment, and that making such minor repairs was a part of his duty as motorman in so far as he was able so to do; that he was not a skilled mechanic; that he had taken off the brake rod, that had been bent, and he took it into the shop; that Burley Long, the assistant master mechanic of the defendant, was in the shop and straightened the rod; that he told Long the air pipe had been broken off square with the air tank and that Long said, "that is a mere trifle." The plaintiff testified that he then went back to fix it, in company with Williams, a negro helper, and that they had their tools out; that the plaintiff was working on the broken air pipe; that in doing so he took a little square blacksmith hammer and tapped it into the threaded portion of the pipe left in the air tank; that he tapped the same in lightly and tried to turn it with a monkey wrench, but that the iron was so soft that it slipped and didn't turn or unscrew the threaded part left in the tank, and at that time Burley Long, the assistant master mechanic, came along and said, "Let me see what I can do with it;" that in obedience thereto he moved over and gave Long his place, which was under the car; that he, Long, took a cold chisel and machine hammer and drove the chisel into the threaded portion of the pipe and applied a pipe wrench to the chisel, and he, Long, and the negro, Williams, at Long's command, threw their strength against the pipe wrench to turn it, and a chip of steel from the wrench snapped off and went into the plaintiff's eye; that this happened not more than five minutes from the time Long commenced his work; that the place to where he moved and that was occupied by him at the time of the injury was about four or five feet from where Long and the negro helper were at work, and that plain-

tiff was, at the time, squatting upon the board walk and watching Long and the negro while they were at work in attempting to remove the end of the pipe; that he had been working for the defendant in the capacity named for about two years and eight months at the time he received the injury, during which time he had operated passenger cars, but during most of the time had operated the freight car; that at the time of the injury he was waiting for the repairs to be made, so he could take his car as soon as it was fixed and go back to work in the usual way with his car.

The testimony of the plaintiff as to how the injury occurred is likewise not disputed by any witness, and Williams' testimony was in substance the same. The negligence charged by the plaintiff is, "that the cold chisel and wrench were wholly unsuited for the use to which the same were being put by the defendant and its employes; that the wrench and cold chisel were not intended to be used together as the same were being used at the time the plaintiff was injured; that the method used by defendant and its servants, Long and Williams, in attempting to remove said piece of broken pipe by means of said cold chisel and wrench was not reasonably safe, and the defendant carelessly and negligently failed to provide a reasonably safe method for such work; that the defendant and its employes, Long and Williams, were careless and negligent in using said wrench and cold chisel as the same were being used at the time of the injury."

H. H. White, a witness for the plaintiff, testified that he was a mechanical and electrical engineer, and had been engaged as such for about 28 years; that he started out after graduating from college as a draftsman for railroad shops and put in four years in the shops; that he was now city engineer. He was asked:

"Q. Mr. White, where a pipe an inch in diameter was broken off flush with the boiler and screwed into the boiler what would be the proper or ordinary manner to remove it? A. Cut it out. Q. What was your answer, Mr. White? A. I would cut out the pipe with a chisel, a diamond point chisel, any chisel you could get in there. Q. I hand you what appears—which is identified as plaintiff's Exhibits A, B, and C, and ask you to explain to the jury now what you mean by removing, but cutting out the pipe. A. Well, assuming that if this chisel was out and assuming that pipe is broken off flush with that 'T,' why, I would cut the pipe out with a diamond point chisel or something you could get through with one side, and after doing that you could take the pipe out and run a tap in the hole. Q. Mr. White, would it be safe in the ordinary manner to remove a pipe of that character to take an iron chisel and drive in there and then with a wrench highly tempered, a pipe wrench, and grasp ahold of that chisel, and turn it with a pipe wrench of that character, would that be a safe and ordinary way? A. I would consider not."

Objection was made, upon which there was no ruling of the court. He was then asked:

"Q. Would it be a dangerous method to remove it in the manner in which I have indicated by a highly tempered wrench applied a highly tempered chisel? A. I should say, yes. (Defendant moves to strike, motion is overruled, and exceptions taken.) Q. I ask would that be dangerous? A. Well, you are assuming with a tool of that kind? Q. Yes. A. Well, that is a pipe wrench made to screw up pipe and takes hold of round surfaces, the teeth of that pipe are only engaged with the corners of this—this is not a round chisel, and for that reason I should think was engaged with the corners, and the chances are it took only one tooth or two teeth—it would be more dangerous in my judgment if this was a round chisel. Q. You mean to say that this tooth not being round, that is octagon? A. Yes, sir (referring to the chisel). Q. I would ask Mr. White, the applying of a tool such as this is, highly tempered steel, to a highly tempered chisel, and turning that, if that would be dangerous? A. Yes, sir."

The plaintiff testified that both the chisel and pipe wrench were highly tempered steel; that the chisel was not round, but that part of it where the pipe wrench was used had square corners; that the piece of steel that was taken from his eye was a tooth or one of the sharp points of the pipe wrench; that he afterwards compared it and it fit exactly.

R. D. Long, the general manager of the defendant and brother to Burley Long, the assistant master mechanic, testified that he knew of the plaintiff making repairs upon his car at different times, and that he, Long, was also a mechanic. Both of them testified and Burley Long was asked:

"Q. Now, Mr. Long, was Mr. Wimmer assisting you in any way in doing this work? A. He was not, at that time. Q. Had you called upon him to assist you when you told him you would take charge of it? A. No, sir. Q. Just state to the court and jury all that you said to Mr. Wimmer when you went up there. A. I told him I would take charge of the repairs of the car and he could stay around until the car was ready to go out. Q. Now, when you took hold of this with the wrench, did anybody say anything when you started to pull on it, or before you started to pull? A. Well, I started to pull it, and couldn't turn it myself, and I asked this man Williams to help me. Q. Did you have Williams there to help you? A. Yes, sir. Q. What did he do? A. He helped me.

Q. Did Mr. Wimmer say anything? A. We went to pulling on it and he told us to look out for our eyes. Q. When you started to pull on it he told you to look out for your eyes? A. Yes. Q. Where was he then? A. He was sitting in front of us on the platform. Q. Now, how long was it after he said that till this accident happened? A. Well, possibly ten seconds. Q. You were pulling on this with this wrench? A. Yes. Q. When he said 'look out' did you take any precautions yourself? A. No, sir. Q. Do you know whether the nigger did? A. No, sir. Q. You don't know whether he ducked his head or not? A. No, I don't. Q. How long had you been using this wrench at the time of this accident? A. Possibly two weeks. Q. Was it pretty nearly a new wrench? A. It was. Q. Mr. Long, I will ask you to state to the jury whether this method of taking out this screw, is, in your opinion, safe and practical, an ordinary method used by well-recognized, good mechanics throughout the county? A. I think so. Q. What did you say? A. I think so. Q. This wrench referred to as exhibit 'D,' I will ask you to state whether or not that is a usual ordinary tool used by machinists throughout the country for the character of work that you were using it for at that time? A. It is not always used; it is used in lots of cases. Q. 1 mean is it considered a proper tool to be used in that kind of work by machinists? A. It is."

R. D. Long, general manager, testified on cross-examination:

"Q. Don't you know that it was the custom for the man operating that car to make any adjustment or fix anything that he could? A. Yes, sir; they did, Mr. Wyand, I think I remember Mr. Wimmer putting up a sunshade—one on this—that car himself, and that he put steps in the car and a little rack for his repairs and things. Q. If there was anything wrong with the car when he brought it in he repaired it if he could? A. Yes, sir; temporary repairs, he did that, yes, sir."

Albert Williams testified for the defendant, referring to plaintiff:

"Q. After he had put it over the pit. what did he do. A. I was, I think, I think there was both of us down there, looking at it, trying to see how to get it out. Q. You and Mr. Wimmer? A. Yes, sir. Q. Where did Mr. Long come in? A. He came out of the engine room there. Q. To the car? A. Yes, sir. Q. Did he say anything to you or to Mr. Wimmer? A. He said, 'get away and let me see can I get that out.' Q. What did you do? A. We got back and let him get under the car and drive that piece of steel or whatever it was, chisel or something. Q. Where did Mr. Wimmer go? A. Mr. Wimmer was sitting on the side—I was sitting here (designating), and Mr. Burley says, 'Let's try it, Spot.' Q. That is what he called you, 'Spot?' A. Yes, sir. I said 'all right,' so we pulled on it and directly Mr. Wimmer

said 'watch out,' and about that time we pulled on it and a piece of steel flew out from the wrench and hit Mr. Wimmer in the eye there. Q. How long was it after he hollered 'watch out' until he got hurt? A. I think about that time—just about the time I think. Q. Just about that time you think it flew and hit him? A. Yes, sir."

The witness testified that he was brakeman for Mr. Wimmer, and that they frequently fixed things about the car when they needed fixing, did a good deal of little work on it, and that they both worked with Burley Long, and that he at different times asked him to assist him in making repairs.

Both the Longs and Ray M. Fink testified that the tools used and the manner of their use were one of the usual ways of performing the work in hand. Fink, however, testified that he would have adopted the method of cutting out the threaded portion of the pipe with the cold chisel. He and plaintiff's witness, White, both testified that that method was less dangerous than the one used. The testimony of all these witnesses shows that they were machinists of long experience.

We are satisfied, in view of the foregoing testimony and the authorities cited, that the trial court was not in error in refusing the defendant's peremptory instructions to the jury.

In the case of R. D. Davis et al. v. A. T. Ball, 76 Okla. 252, 185 Pac. 105, this court held, in an opinion by Owen, C. J., par. 4:

"Whether the injury sustained by the employe is due to the negligence of the master in not furnishing a sufficient number of fellow servants with which to safely do the work is a question of fact to be submitted to the jury, where there is any evidence which reasonably tends to support the cause of action." Citing in support thereof, Midland Valley R. Co. v. Graney, 77 Okla. 54; Helm v. Mickleson, 66 Oklahoma, 170 Pac. 704; Petroleum Iron Works v. Bullington, 61 Okla. 311, 161 Pac. 538; Russell v. Borden's Condensed Milk Co. (Utah) 174 Pac. 633; 3 Labatt's Master and Servant (2d Ed.) section 936."

The defendant urges that the trial court erred in giving instruction No. 5 which is as follows:

"You are instructed that if you find and believe from the evidence that the master mechanic knew of the plaintiff's position at the time he commenced working on the car, and you further find that the kind and character of the work to be done upon the car was dangerous and unsafe to the plaintiff in the position he occupied but unknown to him, it was the duty of the master mechanic to notify and advise the plaintiff to put himself at a reasonable distance from

the car, where he would not likely be injured, and the failure to so notify him would be negligence on the part of the defendant."

And in the refusal of the court to give defendant's requested instruction No. 12, which is as follows:

"You are instructed that under the pleadings and evidence in this case it was not the duty of the defendant company to warn or instruct the plaintiff to get into a safe place and out of the way of any accident at the time that its master mechanic started to work, or at any time during his progress of the work."

The first ground urged by the defendant in its brief in support of this assignment of error is that the amended petition of the plaintiff did not charge negligence for failure to warn the plaintiff at the time of the injury.

It is true that the plaintiff's amended petition did not charge negligence for failure to warn him, but the defendant took the position at the trial that plaintiff's remaining near where the work was being carried on was contributory negligence, and requested and tendered a general construction on that question, and another one, in effect, "that if the plaintiff knew or by the exercise of reasonable care ought to have known that an accident of this kind would probably happen or might happen, then it became his duty to seek a place of safety." Both of these instructions were given by the court without modification.

The instruction complained of, in effect, placed a reciprocal duty upon the master— "that if you find from the evidence that the master mechanic knew of the plaintiff's position at the time he commenced working on the car, and further find that the character of the work was dangerous and unsafe to the plaintiff in his then position, but unknown to him, it was the duty of the master mechanic to warn the plaintiff and his failure to warn him would be negligence on the part of the defendant."

The record further discloses in this connection that the defendant tendered five other instructions, which the trial court gave to the jury without modification: (a) Defining the duty of the master to use reasonable care to furnish the servant with reasonably safe tools, appliances, and instrumentalities for the doing of the work, and that the master is responsible for the proper discharge of such duty on the part of its servants; (b) that the burden was upon the plaintiff to prove by a preponderance of the testimony the allegations of negligence as charged in his petition; (c) the assumption of risk by the plaintiff; (d) that the mere fact of the

happening of the accident in cases of this kind raises no presumption whatever that the defendant is negligent, that in case of an accident the burden is upon the plaintiff to show to the satisfaction of the jury by a preponderance of the evidence that the defendant was guilty of some act of negligence charged in the plaintiff's petition, and that such negligence was the proximate cause of the plaintiff's injury; (c) an instruction as follows:

"The fact that the defendant is a corporation should not in any manner militate against it. This company is entitled, under the law to the same fair and impartial trial to which any citizen of the county is entitled. Its rights and liabilities should be measured and tested by the same rule that the rights of any citizen are measured and tested, and in considering your verdict you should be entirely free from any passion or prejudice, and give to each of the parties that fair and impartial consideration and hearing which the law guarantees to him."

The foregoing were in addition to the general instructions of the court, placing the burden on the plaintiff to prove all his allegations by a preponderance of the evidence, and that the plaintiff must show himself free from negligence, and, referring to the defendant, that the party is not in law chargeable with the results which do not naturally and reasonably follow as a consequence of his conduct, and that the employe assumes such risks as are ordinarily incident to the service in which he engages, but he does not assume risk unknown to him or which he could not have known by the exercise of ordinary care, and hazards which are caused by the failure of the master to use an ordinary safe method in which to perform the master's work, and that the defendant cannot use a dangerous method in performing its work if it knows and has at its command a perfectly safe one; and the court, near the conclusion of his general charge, instructed the jury in this language.

"You are instructed that all of these instructions must be considered together, and that you have no right to consider one to the exclusion of the other instructions in this case."

This shows that every issue made by the pleadings and evidence was submitted to the jury by the court, and in each instance in the exact language requested by the defendant.

We have carefully examined the entire record, including the instructions given and refused, and it does not appear to us that the errors complained of in that respect, as well as in overruling the objections of the defendant to testimony offered, have probably resulted in a miscarriage of justice or con-

stitute a substantial violation of any constitutional or statutory right of the defendant, and the same do not constitute reversible error. Rev. Laws 1910, sec. 6005.

We think the decided weight of authority is to the effect that the giving of instructions on abstract questions of law, which are not authorized by the pleadings and evidence, will not constitute a ground for reversal where no prejudice results to the complaining party, and this is so whether or not the instructions state a correct rule of law. 4 Corpus Juris, 1023, and authorities there cited; Chicago, R. I. & P. R. Co. v. Pruitt, 67 Oklahoma, 170 Pac. 1143; Chickasaw Compress Co. v. Bow, 47 Okla, 576, 149 Pac. 1166; Pearson v. Yoder, 39 Okla. 105, 134 Pac. 421, 48 L. R. A. (N. S.) 334; Payne v. McCormick Harvesting Machine Co., 11 Okla. 318, 66 Pac. 287; City of Oklahoma City v. Meyers, 4 Okla. 686; Ponca City Ice Co. v. Robertson, supra. The case of Ponca City Ice Co. v. Robertson, 67 Oklahoma, 169 Pac. 1111, is a case directly in point. There this court in an opinion by Hardy, J., said:

"While paragraph eight of the charge was probably erroneous in that it submitted to the jury the failure of defendant to warn deceased, yet as under the issues made in the pleadings and sustained by the evidence plaintiff was entitled to recover, and from an examination of the entire record we reach the conclusion that substantial justice has been done, we are precluded from reversing this case on account of the error, if any, in the giving of such instruction. Section 6005, Rev. Laws 1910."

The plaintiff in error urges that the trial court erred in submitting the measure of the plaintiff's damages as contained in item 5 of his instructions to the jury, which is as follows:

"If you find for the plaintiff, you will allow him as damages such sum as will compensate him for the injuries he has sustained, not exceeding ten thousand dollars, which is the amount sued for. The elements entering into the damages are as follows: (1) The value of his time during the period he was disabled by the injury. (2) If the injuries have impaired Wimmer's power to earn money in the future, such sum as will compensate him for such loss of power. (3) Such reasonable sum as the jury shall award him on account of any pain and anguish as he had suffered by reason of his injuries. (4) Such prospective suffering and loss of health, if any, as the jury may believe reasonably certain to result therefrom, from all the evidence before them in the case, and that he will sustain by reason of his injuries. (5) Such sum as the jury deem proper for the inconvenience of going through life with one eye and such mortification and anguish as Wimmer has suffered and will continue to suffer by reason of the mutilation of his face, and the fact that he may become an object of curiosity and ridicule among his fellows."

In reference to this item, counsel for plaintiff in error say in their brief:

"This question has not been settled in this jurisdiction, and there is quite a diversity of judicial opinion thereon. Some courts hold that it is a proper measure of damages. Others hold that it is a proper measure of damages where the injury was inflicted wantonly or recklessly. Other courts hold that it is too remote and speculative to ever form the basis of damages. We present the matter to the court because it is of first impression and it is a question continually arising in this character of cases in this state. We have always taken the view that the proper rule was that such damages could only be recovered in cases where the injury was wanton. Some of the cases holding such injuries cannot be recovered for, but that they are too remote and speculative, are as follows: Chicago, B. & Q. R. Co. v. Hines, 43 Ill. App. 299; Maynard v. Oregon R. & Nav. Co., 46 Ore. 15, 78 Pac. 983; Chicago, R. I. & P. R. Co. v. Canfield, 63 Fed. 396; Diamond Rubber Co. v. Harryman (Colo.) 92 Pac. 922; Southern Pacific R. Co. v. Hetzer, 135 Fed. 272; Vandalia Coal Co. v. Yemm, 175 Ind. 524, 92 N. E. 49; Harrod v. Bisson, 48 Ind. App. 549, 93 N. E. 1093."

In answer to this contention of counsel for the plaintiff in error, counsel for defendant in error, in their brief say:

"In view of the fact that this question has not to our knowledge, been presented to the court, and in view of its importance, we have made a somewhat extensive investigation of the authorities in regard thereto. We wish to concede that the higher courts of Illinois and Indiana hold exactly what the defendant contends, and such is the holding of these courts at the present time. However, the authorities cited by the defendant from the other states, and from the Federal Reporter, as upholding the rule, are no longer followed, and such is not the rule within these jurisdictions. The decided weight of authority, supported by proper reasoning, holds that humiliation and mortification for the disfigurement of a person are proper elements of damages to be considered by the jury. 13 Cyc. 145; Birmingham v. Lewis (Ala.) 9 South. 243; Railroad Co. v. Dobbins (Ark.) 30 S. W. 887; Atlantic, etc. R. Co. v. Wood, 48 Ga. 565; Reliance Textile, etc., Works v. Mitchell (Ky.) 71 S. W. 225; Sherwood v. Chicago, etc., R. Co. (Mich.) 46 N. W. 773; Schmitz v. St. Louis, etc., R. Co. (Mo.) 24 S. W. 472; Heddles v. Chicago, etc., R. Co. (Wis.) 46 N. W. 135; Ferguson & Wheeler Land, Lumber & Handle Co. v. Good (Ark.) 165 S. W. 628; The Oriflamme, 18 Fed. Cases No. 10572, 3 Sawy. 397."

Sutherland's excellent work on Damages, vol. 4, sec. 1241, holds as follows:

"Element of Damage. The law aims to afford full redress for personal injuries as well as for all others. The sufferer is entitled to compensation from the person by whose fault the injury occurred for the pain resulting from the corporal hurt so long as it produces pain; for mental suffering naturally resulting from the injury or wrong, and, according to the better opinion, whether such suffering be apprehensive and anxiety from the depressing effect of the wrong or induced by its alarming character; for wounded sensibility or affection, and for sense of wrong and insult by reason of the malice of the wrongdoer and the incidents of the infliction; for impaired health and working capacity, mutilation, or disfigurement."

In the case of Ferguson & Wheeler Land, Lumber & Handle Co. v. Good, supra, in which the jury was allowed to take into consideration the disfigurement of the plaintiff caused by the loss of his eye, in arriving at the damages, the court held:

"The humiliation and mental anguish that must necessarily be experienced by the personal disfigurement resulting from the loss of an eye, is a proper element for the consideration of the jury."

In Coombs v. King (Me.) 78 Atl. 468, Ann. Cases 1912-C, 1121, the court approved an instruction permitting the jury to find for the plaintiff for humiliation and mortification by virtue of disfigurement, saying:

"There is good reason for the rule. The disfigurement is a physical injury. It is a continuing injury. The mental suffering may continue with it. The mental suffering is a real injury. It proceeds necessarily and inevitably from the physical injury. It is a natural consequence of the injury. Compensation omitting this element is not full compensation. One might be made repulsive to the sight for life with comparatively little physical injury, and yet, according to the rule contended for, be entitled to but little compensation."

In Amanta v. Michigan C. R. Co. (Mich.) 143 N. W. 76, where the injury complained of was the loss of a leg or arm, the court approved an instruction allowing the jury to consider humiliation for such condition, and holding that the physical condition of plaintiff was a complete answer to the contention that there was no evidence of humiliation and of future suffering, although it appeared that the wound had completely healed.

In Shortridge v. Scarritt Est. Co. (Mo. App.) 130 S. W. 126, the injury complained of resulted in disfigurement to the face, and the court sustained a verdict for mental suffering arising from contemplation of the disfigurement, saying:

"The distinction sought to be made, in the cases to which we have referred, between mental pain caused by physical pain and mental pain produced by bitter knowledge that the victim would be maimed or disfigured for life, is more refined and subtle than it is practical or humane. How can it be said that one is more remote and intangible than the other? Both are real, substantial, natural consequences of the injury that caused the disfigurement. It is just as certain that the injured person will be oppressed by a sense of humiliation and mortification over the despoiling of his body, as it is that he will suffer mental anguish as a result of his physical pain. The jury can understand the nature and extent of the one as well as of the other and estimate the compensation of each with equal exactness. To deprive plaintiff of this element of his damage would be violative of the fundamental rule that gives to the plaintiff, injured by the negligence of the defendant, full and fair compensation for the actual damages suffered."

The Supreme Court of North Carolina, in Britt v. Carolina N. R. Co., 61 S. E. 601, sustained the admission of a statement by the plaintiff to the effect that it almost broke his heart to know that he would be a cripple for life, saying:

"This, however, is a part of the suffering, like the physical suffering, the decreased earning capacity, the cost of nursing and medical attention, which are a part of the 'present and prospective loss' resulting from the injury, and the immediate and necessary consequence thereof."

In the case of United States Exp. Co. v. Wahl, 94 C. C. A. 260, 168 Fed. 848, the court held that it was proper to consider the humiliation resulting from the disfigurement from the loss of an eye, and considered the law settled in this respect, by virtue of the case of McDermott v. Severe, 202 U. S. 600, 50 L. Ed. 1162.

The cases quoted above are the recent expressions upon this question that we have been able to obtain. However, such principle has been the established rule throughout most of the states for a long period of years.

We are satisfied from a consideration of the authorities cited from the courts of last resort in their jurisdiction that as is said by counsel for defendant in error in their brief, "the decided weight of authority by proper reasoning is to the effect that mutilation and mortification for the disfigurement of a person are proper elements of damages to be considered by the jury," and we so hold.

In view of the record in the instant case and the fact that we do not find that the amount of compensation awarded the plaintiff by the jury in the instant case is ex-

cessive, as contended for by the defendant, we hold that the instruction complained of does not constitute reversible error, in that the jury was, in our opinion, in no wise prejudiced by the instructions complained of. On the question of the amount of this verdict this court, in the case of Chicago, R. I. & P. R. Co. v. De Vore, 43 Okla. 534, 143 Pac. 864, held that the judgment for $15,000 given a locomotive engineer, 34 years of age, strong and healthy, earning $125 to $150 per month, life expectancy of 34 years, and only one eye lost, was not excessive. In the case of Bower v. Chicago N. W. R. Co., 148 N. W. 145, the Supreme Court of Nebraska held that a verdict for $11,000 for injury to locomotive engineer, 54 years of age, health good, earning capacity $157 per month, left eye injured necessitating its removal, was not excessive. In the case of Atchison, T. & S. F. R. Co. v. Hargrove (Texas) 177 S. W. 509, the verdict in favor of the railroad brakeman for the loss of an eye in the sum of $10,000 was affirmed.

We think that the testimony in this case reasonably tends to support the verdict of the jury, and this court frequently has held that in such cases the verdict will not be disturbed. Smith v. Star Mercantile Co., 54 Okla. 502, 153 Pac. 1188; Linkhart v Kirkhart, 54 Okla. 699, 154 Pac. 645.

The judgment of the trial court, therefore, is affirmed.

OWEN, C. J., and KANE, McNEILL, and HIGGINS, JJ., concur.